UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

THOMAS J. MIHAL,                          )
           Plaintiff,                      )
                                )
      vs.                                   )          1:06-cv-482-SEB-JPG
                                )
ST. VINCENT CARMEL HOSPITAL,         )
INC.,                                          )
           Defendant.                   )

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

      This cause is before the Court on Defendant's Motion for Summary Judgment

[Docket No. 57], filed on May 25, 2007, pursuant to Rule 56 of the Federal Rules of Civil

Procedure and Local Rule 56.1.  Plaintiff, Thomas Mihal, brings his claim against his

former employer, Defendant, St. Vincent Carmel Hospital, Inc. ("St. Vincent"), for its

allegedly discriminatory actions towards him based on his race (Caucasian) and for

allegedly retaliating against him for engaging in protected activity, in violation of Title

VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*.  For the

reasons detailed in this entry, we <u>GRANT</u> Defendant's Motion for Summary Judgment.

## **Factual Background**

Early in 2004, Mihal interviewed for employment with Jim Fortin ("Fortin"),

Facility Manager for Aramark Management Services ("Aramark")[1] at St. Vincent, and

Karen Gohr ("Gohr"), Human Resources Coordinator for St. Vincent.  Mihal Dep. at 55.

Mihal was subsequently hired as a full-time Environmental Services Attendant on May

10, 2004, id. at 31-32, a decision made by Fortin as well as St. Vincent's human resources

department.  Fortin Dep. at 14-15.  Mihal, Fortin, and Gohr are all Caucasians.  Mihal

Dep. at 36-37; Jeffras Aff. ¶ 3.  Mihal was assigned to work the evening shift, which went

from 2:30 p.m. to 11:00 p.m.  Mihal Dep. at 32.  As a member of the evening shift, his

direct supervisor was Darlene Hall ("Hall"), an Aramark employee and Evening Shift

Supervisor for St. Vincent's environmental services personnel, who reported directly to

Fortin.  Id. at 36-37; Fortin Dep. at 19.  Hall is also Caucasian.  Mihal Dep. at 36.

Mihal's main duty was to clean the surgical rooms on a daily basis, but, as a "relief

person," he also filled in for other environmental services personnel when necessary.  Id.

at 28.  In this "relief" capacity, his duties varied, including cleaning the medical surgical

department, the MRI department, the cafeteria, and doing dismissals (cleaning the rooms

of patients who had recently been dismissed from the hospital).  Id.  Seven of the

approximately twelve environmental services attendants who were assigned to the

evening shift at St. Vincent were employed throughout Mihal's tenure there.  Id. at 38.

Those individuals and their respective races are: Willie Green, African-American; Diana

Jackson, Caucasian; Larry Morris, Caucasian; JoEllen Burkett, Caucasian; Anthony (last

---

[1] Aramark Management Services provides on-site supervisory personnel for St. Vincent's environmental services employees.  Def.'s Interrog. Resp. No. 16.

2

name unknown), African-American; Willie Bobbit, African-American; and Stephanie

Jones, Caucasian.  Id. at 38-39.


**Plaintiff's Performance and Discipline**

During the time Mihal was employed with St. Vincent, he incurred a number of

counseling sessions and/or disciplinary actions.  Fortin and Hall first spoke with him in

August 2004 regarding his attitude, instructing him that he needed to be "more of a team

player."  Mihal Dep. at 42-43.  This incident was not a formal disciplinary action nor did

Mihal suffer any adverse consequences, such as suspension, lost pay, or altered duties,

because of it.  Id. at 43, 45.  Additionally, on October 25, 2004, Mihal received a

counseling session for a violation of the Environmental Services Department's dress

code, a violation to which Mihal objected.  Id. at 51-53, 84-85.

The majority of Mihal's other disciplinary issues related to St. Vincent's policy

regarding authorized breaks.  According to St. Vincent Environmental Services

Departmental Guidelines, associates may take their respective breaks only at authorized

times and places and, if they are unable to do so, they must notify their supervisor.  Id. at

159.  While on breaks, associates are prohibited from loitering in public areas of the

hospital.  According to Mihal, authorized break areas are limited to the break room, the

cafeteria, outside at the "smokers' table," or next to the associate's locker.  Id. at 74-75.

Mihal acknowledges that during his employment term he understood this policy.

However, on August 20, 2004, Mihal received a counseling session from Ms. Hall

after she discovered that he was in the Respiratory Therapy waiting area, which was not an authorized break area.  Id. 81.  He admits he was "finishing [his] break and talking to another associate in front of the TV in her station," but denies that he was actually watching the television.  Id. at 79-80.  Hall advised Mihal that he was required to adhere to the break policy and was warned that future violations could result in disciplinary action, including termination, but his responsibilities did not change.  Id. at 82.  Mihal speculates that one of his fellow associates, Willie Green ("Green"), had something to do with reporting this incident.[2]  Id. at 64.

Mihal received his first written warning on August 30, 2004, after Hall found him checking the status of his personal stock investments on a human resources computer prior to his authorized break.  Id. at 45-48, 83.  Mihal again speculates that Green reported his behavior to Hall this time as well.  Id. at 49-51.  Mihal was next written up on December 30, 2004, again for taking an unauthorized break.  Id. at 86.  Hall found him

---

[2] Mihal claims Green did other things to harass him and other Caucasian associates, such as: commenting within Mihal's earshot that "no white son of a bitch is taking my job away," which Mihal did not report to Fortin or Hall, but did mention to Gohr (Mihal Dep. at 182); cleaning the ceiling directly above where Mihal and a fellow employee were having lunch so that dust fell in their food, which Mihal reported to Hall and Gohr (Id. at 120, 133-34); stating, while in the presence of Mihal and other Caucasian employees, "one down, four to go," after a Caucasian employee with whom Green previously had an altercation was fired from St. Vincent, which they all reported to Fortin, Hall, and Gohr (Id. at 139-40); and pushing Mihal's hand off of an elevator button with a mop, which Mihal did not report (Id. at 125-27).  Mihal also alleges that a nurse once told him that an associate matching Green's description threw trash in a stairwell that Mihal had just cleaned (Id. at 184-85).  He did not report this to his supervisors either.  The relevance of these allegations is reduced by the fact that Green was not one of Mihal's supervisors and had nothing to do with the decision to terminate Mihal.  Additionally, a number of these incidents were not ever reported to Mihal's supervisors.

watching television in the cafeteria after he missed a page for an emergency clean because he had turned his pager in prior to the end of his shift.  Id. at 57-61.  Mihal claims the page was "fictitious" and used to "set [him] up," but acknowledges that this explanation is again based on his own speculation.  Id. at 92.  Despite having been reprimanded on previous occasions about unauthorized breaks, Mihal received no additional punishment beyond the written warning.  Id. at 71-72.

**Plaintiff's Complaints to Defendant**

After Mihal received his second written warning at the end of 2004, he met with Fortin and Hall to complain that he was being "singled out, that there were other people that were not doing their job [sic] . . . people that were sluffing off, [and] that [he] was being singled out."  Mihal Dep. at 67-68.  Additionally, he told Fortin that "Willie Green, JoEllen Burkett, and the whole day crew, [Fortin's] pride and joy, [Fortin's] shift" were not doing their jobs.  Id. at 68.  Specifically, Mihal mentioned an incident in which he witnessed some of the women from the day shift leaving their shifts to go Christmas shopping and returning with fast food bags.  Id.  Although Mihal could not identify these women by name, he indicated they were all Caucasian.  Id. at 70-71.  Mihal contends that these problems were not just between himself and the day shift – "[t]his was the whole second crew versus the whole first crew."  Id. at 69.

On January 10, 2005, Mihal submitted a written complaint to Gohr, St. Vincent's Human Resources Coordinator, requesting that it be placed in his file as a complaint on a

disciplinary action.  Id. at 98-99.  In it he stated that he was being singled out from other workers who "are only around due to race, gender and friends with management because their work doesn't merit employment" and that "[g]ood employees are being subjected to misguided management due to overcompensation for addressing poor work ethic, gender and racial issues."  Exh. 6.  He also outlined his complaint with Gohr, indicating that he recalled telling her "basically that we had a problem, a race/gender – a disconnect between management and staff."  Id. at 101.  During this discussion, he also told Gohr of other alleged incidents that did not involve him personally and are unrelated to his Complaint, but, according to Mihal, his basic message to Gohr was that there was "a problem and there's a disconnect, a discontent, in the workforce."  Id. at 102.  Fortin did not become aware of the January 10th complaint until after Mihal was terminated.  Fortin Dep. at 56.

**Plaintiff's Termination**

On April 15, 2005, Mihal placed a suggestion card which he had written into the Environmental Services Department's suggestion box.  Mihal Dep. at 161-162.  The card read as follows:

> Jim – You had better tell Darlene not to cover up for Willie & JoEllen.  Willie snitched again and I was called in on his lying B.S.  His is messing with my livelyhood [sic].  If you don't do something about it I will.  I'm not going to lose my job or bonus because of some racist trying to get me and other whites he doesn't like in trouble by tattling to mommy.  I've dealt with this in a civil manner up to this point.  I have given you a good work ethic and done more than asked but it seems not to have any bearing when Willie calls Darlene to

6

> snitch or rat someone out.  She believes his spying which is always "out of his
> work area."  If he spent half of the effort on his work as he does trying to get
> his enemies in trouble there wouldn't be as many complaints about him and
> JoEllen sneaking off to areas to do whatever they do.  They are offensive to
> many and I have no use for a snitch.  In prison they kill snitches.  He will not
> interfere with my livelyhood [sic] again.

Exh. 13.[3]

Mihal believes Fortin retrieved the suggestion card on Tuesday, April 19, 2005.

Mihal Dep. at 162.  After Fortin reviewed its content, he initiated an investigation to

determine who had written it.  Fortin Dep. at 73.  He compared handwriting samples from

various attendants and determined that the handwriting looked most similar to Mihal's.

Id. at 74.  Fortin informed Gohr of this conclusion and together they discussed possible

repercussions, including Mihal's termination.  Id. at 75-76.  They then brought the

situation to the attention of Charles Jeffras, St. Vincent's Director of Human Resources

and a member of St. Vincent's security team.  Id. at 76-77.  Mr. Jeffras, in consultation

with Fortin and other human resources personnel, determined that the content of Mihal's

comments was serious enough to warrant termination under St. Vincent's Workplace

Violence Prevention and Response Policy (the "workplace violence policy").  Id. at 77.

In relevant part, the workplace violence policy states:

> Conduct that is physically harassing, intimidating or that presents a challenge
> to fight, or that constitutes veiled or direct threats, assaults or attempts to
> assault and/or sabotage is prohibited.  Any activity of this nature, whether by

---

[3] A few sentences written on the suggestion card have been crossed out on the copy in the
record.  However, all parts still remain legible and neither party comments upon this, so we
attribute no significance to this fact.

an associate, patient, visitor or other outsider, will not be tolerated.  Any
associate found to be in violation of this policy will be subject to disciplinary
action, up to and including termination.

Exh. 8.  The workplace violence policy references and incorporates St. Vincent's

Personal Conduct/Discipline policy, which allows for immediate termination for even a

single violation of St. Vincent's rule prohibiting violence.  Exhs. 8-9.  Mihal

acknowledges that at the time he knew of each of these policies and that they were in

place when he was terminated.  Mihal Dep. 148-150.

When Mihal arrived at work on April 19, 2005, a St. Vincent security officer

escorted him to the Human Resources Department to speak with Fortin, Gohr, and

members of the security team.  Id. at 170-71.  Fortin asked Mihal if he had written the

suggestion card and Mihal admitted that he had.  Id. at 172-73.  According to Fortin,

Mihal explained the comments by stating that he was tired of and frustrated with "JoEllen

and Willie snitching on him."  Fortin Dep. at 78.  Fortin then informed Mihal that his

employment with St. Vincent was terminated because his written message on the

suggestion card violated St. Vincent's workplace violence policy.[4]  Id. at 78-79; Mihal

Dep. at 173-74.  Mihal claims he did not intend his comments to be threatening and that

---

[4] There is a dispute between the parties regarding which St. Vincent employee actually
made the decision to terminate Mihal.  St. Vincent claims that while Fortin and Gohr
recommended Mihal's termination, Jeffras made the ultimate decision.  Def.'s Interrog. Resp.
No. 2; Jeffras Aff. ¶ 5-6.  Mihal contends that Fortin was the final decision-maker.  See Pl.'s Br.
at 4, ¶ 6.  Mihal bases his belief on the facts that Fortin confirmed his job responsibilities
included "[h]iring, interviewing, terminating, daily operations . . ." (Fortin Dep. at 9-10) and that
Fortin, not Jeffras, was the one who informed Mr. Mihal that he was terminated.  Mihal Dep. at
171.

the only way in which Fortin could reasonably have considered them a threat would be as a threat that Mihal would inform upper management about Fortin's inability to address racial issues in the workplace.  Mihal Dep. at 168.  Following his termination of employment, Mihal filed this lawsuit.

## Legal Analysis

### I.      Standard of Review

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party.  See id. at 255.  However, neither the "mere existence of some alleged factual dispute between the parties," id., 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment.  Michas v. Health Cost Controls of Ill., Inc., 209 F.3d 687, 692 (7th Cir. 2000).

Summary judgment is not a substitute for a trial on the merits nor is it a vehicle for

9

resolving factual disputes.  Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir.

1994).  Therefore, after drawing all reasonable inferences from the facts in favor of the

non-movant, if genuine doubts remain and a reasonable fact-finder could find for the

party opposing the motion, summary judgment is inappropriate.  See Shields Enterprises,

Inc. v. First Chicago Corp., 975 F.2d 1290, 1294 (7th Cir. 1992); Wolf v. City of

Fitchburg, 870 F.2d 1327, 1330 (7th Cir. 1989).  But if it is clear that a plaintiff will be

unable to satisfy the legal requirements necessary to establish his or her case, summary

judgment is not only appropriate, but mandated.  See Celotex, 477 U.S. at 322; Ziliak v.

AstraZeneca LP, 324 F.3d 518, 520 (7th Cir. 2003).   A failure to prove one essential

element "necessarily renders all other facts immaterial."  Celotex, 477 U.S. at 323.

The party seeking summary judgment on a claim on which the non-moving party

bears the burden of proof at trial may discharge its burden by showing an absence of

evidence to support the non-moving party's case. Celotex, 477 U.S. at 325.  A plaintiff's

self-serving statements, which are speculative or which lack a foundation of personal

knowledge, and which are unsupported by specific concrete facts reflected in the record,

cannot preclude summary judgment.  Albiero v. City of Kankakee, 246 F.3d 927, 933 (7th

Cir. 2001); Stagman v. Ryan, 176 F.3d 986, 995 (7th Cir. 1999); Slowiak v. Land

O'Lakes, Inc., 987 F.2d 1293, 1295 (7th Cir. 1993).

The summary judgment standard is applied rigorously in employment

discrimination cases, because intent and credibility are such critical issues and direct

evidence is rarely available.  Seener v. Northcentral Technical Coll., 113 F.3d 750, 757

(7th Cir. 1997); <u>Wohl v. Spectrum Mfg., Inc.</u>, 94 F.3d 353, 354 (7th Cir. 1996).  To that end, we carefully review affidavits and depositions for circumstantial evidence which, if believed, would demonstrate discrimination.  However, the Seventh Circuit has also made clear that employment discrimination cases are not governed by a separate set of rules, and thus remain amenable to disposition by summary judgment so long as there is no genuine dispute as to the material facts.  <u>Giannopoulos v. Brach & Brock Confections, Inc.</u>, 109 F.3d 406, 410 (7th Cir. 1997).

## II.      Hostile Work Environment Claims

In his Complaint, Mihal initially included a hostile work environment claim against St. Vincent.  However, he has since abandoned that claim, conceding that "in light of the Seventh Circuit's stringent standard of summary judgment, discovery has generated insufficient evidence to prevail on the hostile environment claim in his Complaint."  Pl.'s Resp. at 2 n.1.  Thus, we <u>GRANT</u> Defendant's Motion for Summary Judgment on this issue.

## III.     Mihal's Reverse Race Discrimination Claim

Under Title VII, it is unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race."  42 U.S.C. § 2000e-2(a)(1).  A plaintiff may prove discrimination

11

under Title VII either with direct evidence of discrimination or indirectly through the burden-shifting analysis established in <u>McDonnell Douglas v. Green</u>, 411 U.S. 792 (1973).  <u>Scaife v. Cook County</u>, 446 F.3d 735, 739 (7th Cir. 2006).  The parties here have addressed only the <u>McDonnell Douglas</u> framework in their submissions, so we shall follow their lead and proceed solely with that analysis.

Traditionally, under <u>McDonnell Douglas</u>, a plaintiff must begin by establishing a *prima facie* case of discrimination.  If one can be established, the burden shifts to the defendant to articulate a nondiscriminatory reason for the actions it took against the plaintiff.  If the defendant can offer a legitimate, nondiscriminatory reason for the employment decision, the burden reverts to the plaintiff to show that there is a genuine dispute of material fact that the proffered reason for the employment action is pretextual. <u>Nese v. Julian Nordic Constr. Co.</u>, 405 F.3d 638, 641 (7th Cir. 2005).

The traditional *prima facie* case requires a showing by the plaintiff: (1) that he was part of a class of persons protected by Title VII; (2) that he was meeting his employer's legitimate job expectations; (3) that he suffered an adverse employment action; and (4) that similarly-situated individuals outside his protected class were treated more favorably. <u>See</u> <u>Elkhatib v. Dunkin Donuts, Inc.</u>, 493 F.3d 827, 830 (7th Cir. 2007).  However, over time, courts have modified these factors to fit various situations, including situations in which members of majority groups believe they were subjected to employment discrimination, as is the case here.  <u>Phelan v. City of Chicago</u>, 347 F.3d 679, 684 (7th Cir. 2003) (citing <u>Mills v. Health Care Service Corp.</u>, 171 F.3d 450, 457 (7th Cir. 1999)).

In such situations, the Seventh Circuit requires a plaintiff to meet a slightly different burden of proof.  The first prong of the McDonnell Douglas framework is not used.  Id.  Instead, in addition to meeting the second, third, and fourth prongs, "such a plaintiff must show that 'background circumstances' exist to show an inference that the employer has 'reason or inclination to discriminate invidiously against whites' or evidence that 'there is something 'fishy' about the facts at hand.'" Ballance v. City of Springfield, 424 F.3d 614, 617 (7th Cir. 2005) (quoting Phelan, 347 F.3d at 684-85); see also Hague v. Thompson Distrib. Co., 436 F.3d 816, 820-22 (7th Cir. 2006) (discussing the reasoning behind, and reaffirming, the modified *prima facie* requirements for reverse discrimination cases).

St. Vincent does not challenge the third prong of Mr. Mihal's *prima facie* case under the McDonnell Douglas framework, to wit, that he was terminated, which constitutes an adverse employment action.  Therefore, only the background circumstances as well as the second and fourth prongs of the McDonnell Douglas analysis are at issue in this situation.

### A.     Background Circumstances

The Seventh Circuit recognizes that "the contours of what constitutes a background circumstance are not precise."  Mills, 171 F.3d at 455.  However, the Seventh Circuit has found that reverse discrimination is not surprising where supervisors "are under pressure from affirmative action plans, customers, public opinion, the EEOC, a

judicial decree, or corporate superiors imbued with belief in 'diversity' to increase the proportion of [minorities] in the company's workforce."  Preston v. Wisconsin Health Fund, 397 F.3d 539, 542 (7th Cir. 2005).   Seemingly in this vein, Mihal claims that a jury could infer that Fortin,[5] "would be concerned with the ramifications and appearances if he terminated an African-American employee."  Pl.'s Resp. at 13.   However, Mihal has presented no evidence similar to that described by the Seventh Circuit to demonstrate that such an inference would be reasonable in this case.  He does not allege, for example, that a program was in place at St. Vincent to increase diversity, that members of the public had complained about a lack of diversity at St. Vincent, or that St. Vincent had received a directive from a court or the EEOC to increase diversity.  In short, there is nothing in the record which would reasonably support the conclusion that either Fortin or Mihal's other superiors were under special pressure to support minorities at the expense of the majority thus making the supervisors more concerned about terminating an African-American employee than a Caucasian employee.

In addition, Mihal contends that it is "fishy" that Fortin allegedly treated similarly situated employees differently based on their race.  To begin with, there is a dispute,

---

[5] As previously mentioned, there is a dispute between the parties as to which specific official at St. Vincent was actually responsible for terminating Mihal.  St. Vincent claims Jeffras made the final decision to fire Mihal, but Mihal contends that Fortin was responsible.  We find that Mihal has presented enough evidence to support the conclusion that Fortin was at least partly responsible for Mihal's termination and thus, construing the facts most favorably for the non-movant, we will assume Fortin was the decision-maker for the purposes of this analysis.  In any case, it is irrelevant which individual was the ultimate decision-maker because Mihal cannot satisfy his burden either way.

which we will discuss in greater detail below, regarding whether Green is similarly

situated to Mihal, and, if he is, whether Mihal's allegedly different treatment was based

on considerations of race.  However, even assuming Mihal's factual assertions to be true,

evidence that members of a minority race were disciplined less severely is not the type the

Seventh Circuit believes "fit[s] the mold" of evidence sufficient to demonstrate relevant

or sufficient background circumstances in a reverse discrimination case.  Ineichen v.

Ameritech, 410 F.3d 956, 960 (7th Cir. 2005) ("The evidence [the plaintiff] relies on, that

several blacks were disciplined less severely, does not fit the mold of [a previous case

finding background circumstances].").  Although deciding the case on other grounds, in

Ineichen, the Seventh Circuit questioned whether the plaintiff's evidence demonstrating

that "several black employees 'were not terminated for engaging in more egregious

behavior'" would qualify as background circumstances, stating that "[i]t certainly does

not fit the typical scenarios with which we recently illustrated the application of the

heightened standard . . . ."  Id.

   Mihal also claims that the fact that Fortin was placed on a work improvement plan

at some point subsequent to the filing of Mihal's EEOC charge constitutes sufficient

background circumstances.  It is undisputed that Fortin's employer, Aramark, placed him

on a performance improvement plan after receiving a succession of complaints about him,

including notification from the EEOC of Mihal's charge of discrimination.  See Fortin

Dep. at 13; Exh. H.  However, Fortin's placement on an improvement plan is not

traceable to the substantive merits of Mihal's EEOC charge; in other words, Aramark did

not tie its actions regarding Fortin to the fact that Mihal's charge had been filed.  Aramark

merely referred to the existence of the charge as one of the contributing factors in its

decision.  Fortin was disciplined for numerous instances of "managerial misconduct"

unrelated to racial discrimination; the fact that those numerous instances of "managerial

misconduct" included Mihal's EEOC charge does not create a "fishy" circumstance

sufficient to demonstrate Fortin's prior propensity to discriminate against Caucasians.

     In sum, although there is no definitive list of situations that would satisfy the

background circumstances requirement, the evidence presented by Mihal clearly does not

comport with the previous scenarios in which the Seventh Circuit has determined

plaintiffs have met the burden set forth in the modified <u>McDonnell Douglas</u> framework.

However, we stop short of a definitive determination as to whether Mihal has made the

requisite showing, because, even assuming he has, his race discrimination claim fails for

other reasons as described below.


     **B.**     **Legitimate Job Expectations and Pretext**

     St. Vincent maintains that it fired Mihal for a legitimate, non-discriminatory reason

– namely, that he failed to meet its legitimate job expectations when he submitted the

comment card that included language St. Vincent considered threatening and when it was

determined that it violated St. Vincent's workplace violence policy.  In his brief, Mihal

does not contend that he was, in fact, meeting St. Vincent's legitimate performance

expectations at the time of his termination.  He admits he authored the comment card in

16

question, that the workplace violence policy was in place at the time of his termination, and that termination was a possible a consequence of any violation of the policy. However, he nonetheless claims that St. Vincent is lying about its proffered reason for his termination, contending that the legitimate expectation inquiry and the pretext inquiry merge in this situation and should be analyzed together.

As noted above, generally courts must first determine whether the plaintiff has established a *prima facie* case before subjecting an employer to the pretext inquiry. Hague v. Thompson Distribution Co., 436 F.3d 816, 823 (7th Cir. 2006) (citations omitted).  However, "in many employment discrimination cases, the second element of the prima facie case, satisfactory job performance, and the issue of pretext focus on the same circumstances because the employer maintains that the discharge was based on its reasonable belief that the employee was not performing in an acceptable manner." Denisi v. Dominick's Finer Foods, Inc., 99 F.3d 860, 864 (7th Cir. 1996), cited in Vanasco v. National-Louis University, 137 F.3d 962, 966 (7th Cir. 1998).

Confronted with a similar set of circumstances, in Rummery v. Illinois Bell Telephone Co., 250 F.3d 553 (7th Cir. 2001), the Seventh Circuit reasoned that "[b]ecause the issue of satisfactory job performance, which lies at the heart of this dispute, must be analyzed in detail at both stages of the McDonnell Douglas test, it is therefore simpler to run through that analysis only once." Id. at 556.  Thus, though we recognize that the *prima facie* case is technically the first step in the burden shifting methodology, since both the legitimate expectations and pretext issues are intertwined in

17

this case, we will proceed to consider whether Mihal has met his burden to show pretext. Consistent with Seventh Circuit directives, if Mihal is found not to have presented sufficient evidence of pretext, his attempt to demonstrate that he was meeting St. Vincent's expectations also necessarily fails.  See Hague, 436 F.3d at 823.

After a careful examination of all the uncontroverted facts, we cannot conclude that St. Vincent's proffered reason for Mihal's termination is pretextual.  In order to demonstrate pretext, Mihal must show that St. Vincent's proffered reason for his termination was "factually baseless, [was] not the actual motivation for the discharge in question, or [was] insufficient to motivate the discharge."  Peters v. Renaissance Hotel Operating Co., 307 F.3d 535, 548 (7th Cir. 2002) (quoting Gordon v. United Airlines, 246 F.3d 878, 889 (7th Cir. 2001)).  It is not within our purview to determine whether St. Vincent's decision to dismiss Mihal was mistaken, ill-considered, or foolish; pretext cannot be established so long as St. Vincent honestly believed its reasons and honestly acted upon them.  See Jordan v. Summers, 205 F.3d 337, 343 (7th Cir. 2000); Cardoso v. Robert Bosch Corp., 427 F.3d 429, 436 (7th Cir. 2005).  Thus, as long as the evidence makes clear that St. Vincent honestly believed Mihal's comments violated its workplace violence policy when it acted to terminate his employment, Mihal cannot meet his burden to establish pretext.  However, if an employer's explanation rings false, we may infer that the employer is attempting to cover up a discriminatory purpose.  See Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 147 (2000).

Mihal first claims that St. Vincent's reason for terminating him is factually

baseless.  He argues that he did not intend for his message on the suggestion card to be threatening and he believes that Fortin could reasonably have viewed it as such only in the sense that Fortin feared that Mihal would go to upper management to complain about him (Fortin) if he did not address Mihal's concerns; nothing in his note could be read to threaten violence against a fellow employee.  Mihal Dep. at 168.  However, it is irrelevant what Mihal actually intended when he wrote the comments or how he thinks Fortin should have interpreted them.  All that matters is how Fortin and the other individuals responsible for his termination honestly interpreted Mihal's comments at the time they made their decision.  Both Fortin and Jeffras, two of the three supervisors who met to determine what action to take with regard to the suggestion card, testified that they believed the threatening nature of the comments was severe enough to warrant termination under St. Vincent's workplace violence policy, which is why he was terminated.  Fortin Dep. at 77; Jeffras Aff. ¶ 5.

St. Vincent's explanation rings true to us.  The Seventh Circuit recognizes that the determination of whether a belief is honestly held, "is often conflated with analysis of reasonableness." Flores v. Preferred Technical Group, 182 F.3d 512, 516 (7th Cir. 1999). In other words, "the more objectively reasonable a belief is, the more likely it will seem that the belief was honestly held." Id.  After reviewing Mihal's suggestion card in its entirety, we find that a reasonable fact-finder could not conclude that Mihal's dismissal was more likely motivated by discriminatory reasons than by the threatening nature of his comments.  In his suggestion card, for example, Mihal accused Green, his fellow

employee, of "messing with my livelyhood [sic]" and commented that "I've dealt with this in a civil manner up to this point."  Exh. 13.  Additionally, after referring to Green as a snitch in the card, Mihal continues, "I have no use for a snitch.  In prison they kill snitches.[6]  He will not interfere with my livelyhood [sic] again."  Exh. 13.  In light of these comments and the overall content and tone of Mihal's message, we cannot conclude that St. Vincent's proffered reason for his termination is factually baseless.

Mihal also points to Green, who, according to Mihal, is a similarly situated employee who offended St. Vincent's workplace violence policy in an arguably more egregious manner and received only counseling as a sanction.  Mihal claims that the fact that Green, an African-American, was not terminated demonstrates that St. Vincent's proffered reason for terminating Mihal was not its actual motivation for his discharge.  Our review does not permit us to find that Green's conduct was sufficiently similar to justify such a conclusion.

Mihal alleges that Green "assaulted" Stephanie Jones, another Environmental Services Attendant (Mihal Dep. at 121), which he claims was in fact a violation of St. Vincent's workplace violence policy, and yet, Green received nothing more by way of a response from St. Vincent that a counseling session.  Jones initially reported this incident to her direct supervisor, Ms. Hall.  Hall Aff. ¶ 4.  After their conversation, Ms. Hall reported her findings to her supervisor, Mr. Fortin, who assured her he would take care of

---

[6] Mihal spent time in prison shortly before he was hired at St. Vincent.

it.  Id. ¶ 5.  According to Fortin, after interviewing both Green and Jones, his understanding of the situation was that Jones approached Green's housekeeping cart and took some supplies off of it without asking, which prompted a verbal exchange between them, and Green eventually grabbed the supplies back from Jones.  Fortin Dep. at 47-48.  Fortin testified that, based on his investigation, he did not consider this incident an episode of workplace violence.  Id. at 51-52.  Both individuals received counseling sessions regarding their behavior toward each other.  Id. at 48.

While Mihal did not witness the incident, he apparently saw Jones afterward and testified that "she was in tears, upset, and wanted [Green] to get – well some action be taken."  Id. at 122.  A fellow employee, Larry Morris, claims he actually witnessed the exchange and testified by way of affidavit that during the confrontation, "[Green] injured [Jones'] leg and touched [Jones'] breast."  Morris Aff. ¶ 5.  However, neither Jones nor Green told Fortin at the time that there were any witnesses to their encounter.  Fortin Dep. at 49.  Additionally, there is no testimony, from Morris or any other individual, that Morris had informed anyone, particularly Fortin or any other supervisor, of what he allegedly witnessed.

For an employee to be similarly situated to a plaintiff for purposes of McDonnell Douglas comparison, a plaintiff "must show that there is someone who is directly comparable to [him or] her in all material respects."  Patterson v. Avery Dennison Corp., 281 F.3d 676, 680 (7th Cir. 2002).  The comparator must be similar "in terms of performance, qualifications, and conduct. . . . This normally entails a showing that the

two employees . . . had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617-18 (7th Cir. 2000).  It is undisputed that Green and Mihal have very similar disciplinary records.  Both received a number of counseling sessions and written warnings throughout their respective tenures at St. Vincent.  There is a dispute between the parties as to whether both employment decisions were made by the same supervisor (Fortin), but as previously explained, we assume for the purposes of this opinion that they were.

In our view, severely threatening language like that which was directed at Green in Mihal's suggestion card, including an insinuation that individuals like Green would be killed in prison, a place from which Mihal had recently been released, is not similar to a verbal dispute between two employees that resulted in one employee grabbing something out of the other's hand.  Additionally, in Mihal's case, Fortin had direct evidence of the offending behavior at issue because Fortin personally reviewed the actual suggestion card Mihal admitted having written.  Neither Fortin, nor any other supervisor, was present when the dispute between Green and Jones occurred.  As a result, Fortin had to rely upon, as he described it, "he said/she said" evidence to determine what took place.  Fortin Dep. at 52.  Mihal points to Morris's deposition testimony in an attempt to demonstrate the severity of Green's behavior during that altercation; however, again, Fortin was never made aware that there were any witnesses to the incident, nor did Morris come forward at the time to report what he saw.  For the above reasons, Green's conduct is clearly

22

distinguishable from Mihal's.

Furthermore, even if Green received more lenient treatment by Fortin for similar behavior, that disparity would not establish that it occurred based on Mihal's race.  "A plaintiff cannot be permitted to manufacture a case merely by showing that the employer does not follow its employment rules with Prussian rigidity."  Walker v. Abbott Laboratories, 416 F.3d 641, 644 (7th Cir. 2005).  It is well-settled that the court does not "sit as a superpersonnel department that will second guess an employer's business decision."  Gordon, 246 F.3d at 889.  Mihal has simply been unable to show that St. Vincent's proffered reason for his termination was not the actual motivation for his discharge.

Because Mihal has not succeeded in establishing that issues of material fact exist which might demonstrate that St. Vincent's proffered explanation is pretextual, it follows, as explained above, that he also has not demonstrated that he was meeting his employer's legitimate expectations, requiring us to GRANT summary judgment in St. Vincent's favor.

IV.   **Retaliation Claims**

Mihal also contends that the termination of his employment constituted retaliation for voicing his concerns about racial discrimination.  As with race discrimination claims brought pursuant to Title VII, a plaintiff may prove a retaliation claim under Title VII either directly or indirectly.  The parties dispute whether Mihal can succeed in making out

23

a claim using the direct method; therefore, we will discuss both approaches here.

### A.      Direct Method

Under the direct approach, a plaintiff "must show evidence that he engaged in a statutorily protected activity (such as bringing a Title VII claim) and as a result, suffered an adverse action." Roney v. Illinois Dep't. of Transportation, 474 F.3d 455, 459 (7th Cir. 2007). Under Seventh Circuit precedent, in order for a plaintiff to satisfy this burden, he or she must show a causal connection between the protected activity and the adverse employment action. Moser v. Dep't of Corrections, 406 F.3d 895, 903 (7th Cir. 2005). To prove a causal connection, Mihal must demonstrate that St. Vincent would not have fired him "but for" his protected activity. See Haywood v. Lucent Technologies, Inc., 323 F.3d 524, 531 (7th Cir. 2003); Wells v. Unisource Worldwide, Inc., 289 F.3d 1001, 1008 (7th Cir. 2002). As discussed above, there is no dispute that Mihal suffered an adverse employment action. Therefore, our analysis focuses on whether he engaged in a statutorily protected activity that caused his termination.

Mihal contends that the proximity in time between April 16, 2005, when Fortin discovered Mihal's comment card,[7] and April 19, 2005, the next scheduled work day

---

[7] In his brief accompanying this motion, Mihal claims that the suggestion card that led to his termination was a formal complaint of race discrimination and thus constitutes protected activity. On that card, among his other comments unrelated to allegations of racial problems or discrimination, Mihal wrote that "[s]ome racist is trying to get me and other whites he doesn't like into trouble." Exh. 13. Defendant argues, first, that this comment does not constitute a complaint of race discrimination on its face and second, that Mihal could not have subjectively

(continued...)

which was also the day Mihal was terminated, is direct evidence of retaliation.  Mihal

does not contend that St. Vincent admitted a retaliatory motive for its actions.  He relies

solely upon the temporal proximity between the submission of the suggestion card and his

termination to demonstrate St. Vincent's retaliatory intent.  It is true that "[c]lose

temporal proximity provides evidence of causation and may permit a plaintiff to survive

summary judgement *provided that there is also other evidence that supports the inference*

*of a causal link*."  Lang v. Illinois Dep't of Children and Family Servs., 361 F.3d 416,

419 (7th Cir. 2004) (emphasis added).  However, the Seventh Circuit has repeatedly held

that "mere temporal proximity between the filing of the charge of discrimination and the

action alleged to have been taken in retaliation for that filing will rarely be sufficient in

and of itself to create a triable issue."  Stone v. City of Indianapolis Public Utilities

Division, 281 F.3d 640, 644 (7th Cir. 2002) (citations omitted); accord Brown v. Illinois

Dep't of Natural Resources, 499 F.3d 675, 684-85 (7th Cir. 2007) (determining the

plaintiff failed to show any direct evidence that he was retaliated against based on his

discrimination complaints when the only evidence he presented was of temporal

proximity).

    While it is true that Mihal was terminated on the next scheduled business day

---

[7](...continued)
believed he was complaining of race discrimination on the suggestion card because, during his
deposition, when Mihal was asked to discuss all of the complaints of race discrimination that he
believed he had made, he did not mention the card.  We do not address this dispute because
Plaintiff has failed to demonstrate the causal connection for other reasons detailed in this
opinion.

following Fortin's discovery of his submitted suggestion card, according to Mihal himself, the suggestion card was not the first time he had complained of racial discrimination to Fortin.  Mihal Dep. at 168.  However, he did not suffer adverse employment actions following his previous complaints, which he claims he made throughout his tenure at St. Vincent.  It was only after Mihal submitted the written document that included language which Fortin, Gohr, and Jeffras concluded was threatening and violated St. Vincent's workplace violence policy that he was fired.[8]  In sum, Mihal does not offer any evidence of retaliation under the direct method beyond the temporal proximity between the submission of the suggestion card and his termination; thus, we find no reason to deviate from the Seventh Circuit's well-settled principle that mere temporal proximity is rarely enough to create a triable issue.  Accordingly, if Mihal's retaliation claim is to survive summary judgment, it must do so under the indirect method.

### B.     Indirect Method

To make out a *prima facie* retaliation claim under the McDonnell Douglas indirect method of proof, a plaintiff must show that (1) he engaged in statutorily protected activity; (2) he met the employer's legitimate expectations; (3) he suffered an adverse

---

[8] As discussed above, Mihal's suggestion card included an accusation that fellow employee Willie Green was a snitch and that Mihal "had no use for a snitch."  Exh. 13.  Mihal concluded that "[i]n prison they kill snitches. [Green] will not interfere with my livelihood again."  Id.

employment action; and (4) he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity.  Graham v. AT&T Mobility, LLC, 2007 WL 2565999, at *3 (7th Cir. Sept. 6, 2007).

It is well established that "[f]ailure to satisfy any one element of the prima facie case is fatal to an employee's retaliation claim."  Id. (quoting Sublett v. John Wiley & Sons, Inc., 463 F.3d 731, 740 (7th Cir. 2006)).  With regard to the second prong, Mihal has introduced no additional evidence or argument beyond that referenced above that he was meeting his employer's legitimate expectations.  Because, as we have previously described, Mihal has not met his burden on this prong, his retaliation claim under the indirect method similarly fails.  Therefore, summary judgment is GRANTED in St. Vincent's favor as to Mihal's retaliation claim as well.  Final judgment will be entered accordingly.  IT IS SO ORDERED.


Date:     11/30/2007

_____

_____
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Kyle Frederick Biesecker
BIESECKER & DUTKANYCH LLC
kfb@bdlegal.com

John Patrick Ryan
HALL RENDER KILLIAN HEATH & LYMAN
jpryan@hallrender.com

Craig M. Williams
HALL RENDER KILLIAN HEATH & LYMAN

cwilliams@HallRender.com